# WESTMORELAND COUNTY.

## September Term, 1796.

Leſſee of JOHN GALBRAITH *v.* JOHN M‘GAW.

THIS was an ejectment for 300 acres of land, on 1796. Campbell's run, *Donegal* townſhip.

The plaintiff ſhewed a location No. 3048, dated 13th *April*, 1769, in the name of *Michael Coffman*, for three hundred acres on the ſouth branch of the *Four Mile* run, bounded, on the ſouth, by the claim of *Philemon Aſkins*; on the eaſt, by the claim of *Thomas Pitton*; and, on the north, by the claim of *Thomas Campbell*.

He then ſhewed an order, by *John Boyd*, (a deputy ſurveyor under *William Thomſon*, ſurveyor of the diſtrict) on *Michael Coffman*, for 3*l.* 5*s.* remainder of ſurveying fees.

*Woods*, for the plaintiff, then ſuggeſting, that the firſt ſurvey, made by *John Boyd*, had not been returned, ſhewed a draught and certificate of a ſurvey of three hundred acres and the allowance, made 11th *February*, 1795, by *Benjamin Lodge*, then ſurveyor of the diſtrict, in purſuance of an application, No. 3048, dated 13th *April*, 1769, with a note annexed, that this ſurvey is ſubject to a claim of *John M‘Gaw*, on a late warrant, but the lines of it appear to have been run twenty odd years ago.

He then ſhewed a conveyance of this location and land from *Michael Coffman* to *William Campbell*, dated 11th *June*, 1790, reciting a previous conveyance, dated 8th *April*, 1775, and (becauſe it did not recite the location) confirming that conveyance. He alſo ſhewed a conveyance by *James Guthrie*, ſheriff of *Wetſmoreland* county, to *William Parks*, reciting a judgment againſt *Thomas Campbell* and *Michael Coffman*, of *October* term, 1773, a *fieri facias* teſted of that term, a levy on a tract of land " on which defendant lives, with a ſmall improvement ſubject to incumbrances ;" and a judgment againſt *William Campbell*, 6th *October*, 1791, a *fieri facias*, 23d *March*, 1792, a levy of " three hundred acres

X

of land, more or lefs, joining lands of *John M'Gaw*,
*Nicholas Wilfon*, and others ; *venditioni exponas*, on both
judgments, and fale, 14th *September*, 1792, of that tract
of land of three hundred acres, more or lefs, joining *John
M'Gaw, Nicholas Wilfon*, and others, to *William Parks*,
to whom the conveyance thereupon is.   And he fhewed
a conveyance of the fame land by *William Parks*, to *John
Galbraith*, dated 18th *February*, 1794, and reciting the
fheriff's deed.

The affiftant who made the furvey under *Benjamin
Lodge*, on 11th *February*, 1795, proved, that he found
old lines round this furvey, except as to part, where he
threw out land, as the old lines contained more than the
lines of this furvey; that he threw out part of that which
*John M·Gaw* claims, and a greater part at the oppofite
end of the furvey ; and that *John M'Gaw* has land out
of this furvey, befides what he claims within it.

*Brackenridge*, for the defendant, produced a warrant
to *John M'Gaw*, dated 29th *December*, 1785, for two
hundred acres including an improvement, joining lands
of *James Campbell* on the north eaft, *William Campbell*,
and *Nicholas Wilfon*, intereft commencing from *March*,
1779 ; and a furvey of two hundred and twenty-five
acres and twenty-two perches, made on this warrant,
27th *June*, 1786.

Evidence, was then given, that, in 1769, there was a
*deadening* on *Coffman's* land; that, in 1770, his houfe was
raifed ; that, in the fall of 1769 or 1770, *John Boyd* made
*Coffman's* furvey, conducted by *Thomas Campbell*, who
faid he had taken in the cream of the land ; that one of
the lines made by *Boyd* is now *M'Gaw's* line, is near a
fpring, which it leaves out of *Coffman's* furvey, and is
near where *Coffman's* houfe was afterwards built, and
goes through a field ; and that *Coffman* fhewed this as
his line, in 1772, to one who propofed to buy from
him, and gave as a reafon why it went through the field,
that he was abfent, when the field was cleared, and the
grubber went over the line ; and faid it was *Thomas
Campbell's doings* to build the houfe fo near the line.

Evidence was alfo given, that, in *February*, 1771,
*John Overun* fettled where *John M'Gaw* now lives,
built a cabbin, cleared two or three acres and put it in
corn, and lived there till *April*, 1772.   His brother-

in-law took poffeffion of it under him, and lived there
till *Overun* fold it, in 1773, to *John Livingston*, who,
the fame year, fold it to *Hugh Lorimer*, who, on 13th
*August*, 1780, affigned his conveyance of it to *John
M‘Gaw*.    There had been a conveyance from *Overun*
to *Livingston*, and it was given to *M‘Gaw*, but was
fince loft.  The conveyance from *Livingston* to *Lorimer*
was dated 9th *November*, 1773, and ftated a purchafe
and bill of fale from *Overun* of 6th *March*, 1773.  *Lori-
mer* fettled on the land the fpring of 1774, and lived
there, except when driven off by the *Indians*.  In 1786
or 1787, one *Rankin* an affiftant furveyor came to make
a furvey for *Thomas Campbell*, on *Coffman's* location,
began at *Boyd's* corner, and went round till he came to
*M‘Gaw's* line, but would not crofs it; and *Campbell*
directed him to enlarge the furvey towards *Philemon
Afkin's* claim.    Evidence was alfo given, that, in
1772, *Coffman* and *Overun* agreed, that the line between
them fhould be two rods beyond the fpring, fo that
*Coffman* fhould have it : another witnefs faid, that *Coff-
man* was to have a way to the fpring.

There was alfo fhewn by the defendant, a written
agreement, under feal, by *Michael Coffman* and *Thomas
Campbell*, dated 8th *April*, 1775, to fell to *William
Campbell*, a tract of land for which he was to take out
a warrant.    This, the defendant's counfel fuggefted
was the deed referred to by the conveyance from *Coff-
man* to *Campbell*, dated 11th *June*, 1790.  And one
witnefs fwore that *Coffman* faid, his located lay over be-
tween the difputed land and the *Four-mile* run.

*Michael Coffman* was called, and fwore, that, in 1768,
he employed a man to make an improvement for him ;
that he cut a clapboard tree, raifed two logs high of a
cabbin ; that he went out next fpring, hired two men,
and worked on the land, fettled there near the fpring,
applied for a location, claimed the land in difpute,
cleared on it, and made no lines with *Overun* ; that *Boyd*
did run the line between his houfe and the fpring, but
told him he had not his compliment, and he would come
back, and make other lines ; that he never came back,
but he underftood one *Hamilton* came, after he had fold
the land to *William Campbell* ; that he intended to hold

1796.

down to the branch of the run; and that *Thomas Campbell* never had any interest in the location.

*Brackenridge*, for the defendant, then produced a copy of a record of an ejectment to *April* term, 1774, for this land, by the lessee of *John Livingston* against *Thomas Campbell*; which stated that, at *January* term, 1775, this dispute was referred, by consent of the parties, to five arbitrators, who, 19th *February*, 1776, awarded that *Thomas Campbell* had no right to the land, and that he pay costs.

*Woods*, for the plaintiff, objected to this on two grounds. 1. Because no agreement of *Thomas Campbell* subsequent to 8th *April*, 1775, could be admitted; for if he ever had any right, he, together with *Michael Coffman*, had, by deed of that date, conveyed this land to *William Campbell*, and afterwards could not affect it by any act of his.—2. Because the judgment against *Thomas Campbell*, and the levy of this land on it was prior to the reference or the ejectment.

*Brackenridge*. No subsequent act of *Thomas Campbell* could deprive us of the benefit of any agreement made while he had an interest. He was tenant in possession; was bound to warrant; and therefore his act is the act of his assignee.

PRESIDENT. The act of *Thomas Campbell* cannot affect *Coffman*, nor *William Campbell*, after the sale to him. A submission is revocable before the award or hearing.

*Brackenridge* then offered a decision of the Board of Property on a *caveat* entered by *William Campbell* against *John M'Gaw*, dismissing the *caveat* because a record in ejectment had been produced.

*Woods*. The court having already rejected the ground of this decision, the decision itself cannot be received.

PRESIDENT. As a decision between the parties in this suit, on the subject now in dispute, it may be given in evidence. Its operation is another thing.

*Brackenridge* contended for the line run by *Boyd*, or, at any rate, the agreed line, as the boundary between the parties.

*Woods* argued, that the line run by *Boyd* was but a line of experiment and never intended to be final, and that the agreed line was incredible.

PRESIDENT. The arbitration or reference and award or report, with the judgment on it, muſt be laid out of the queſtion, as not binding the preſent parties. If ſo, as the deciſion of the Board of Property ſtates this as its foundation, it cannot, with propriety, be allowed to influence this queſtion.

The location intitled *Coffman* to three hundred acres, but he might limit himſelf, if he pleaſed to one hundred. He did limit himſelf by *Boyd's* line, which, if acquieſced in, was deciſive. He might indeed have called on the public authority to change it; and it would have been changed, if no intermediate legal or equitable claim were affected by the alteration. But, if an intermediate right interfered, the alteration could not affect it.

The only clear evidence of the interference of public authority, to alter the limitation of *Coffman's* claim, is the ſurvey made by *Benjamin Lodge*, 11th *February*, 1795. That indeed refers to *old lines*. How, or when, or why, the old lines were made, it does not appear.

The queſtions then are, Were thoſe old lines made by authority, were they ſuch as would have been a limit-ation of *Coffman's* claim, or were they voluntary, and not binding him? If they were voluntary and not bind-ing him, were they an alteration of *Boyd's* authoritative ſurvey? If they were authoritative, did any intermedi-ate legal or equitable right intervene?

Before 11th *February*, 1795, a legal right, *M'Gaw's* warrant and ſurvey, intervened; and no act done by *Galbraith then*, could affect the title acquired by *M'Gaw before*.

The agreed line reſts on the credibility of the wit-neſſes; and the truth muſt be aſcertained by you.

The jury found a verdict for the defendant.